UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Neil Brandon Wolfson,

          Plaintiff,

Civ. No. 14-4469 (JNE/BRT)

v.

Allianz Life Insurance Company
of North America,

**REPORT AND
RECOMMENDATION**

          Defendant.

Jared M. Goerlitz, Esq., Peterson, Fram & Bergman, PA, counsel for Plaintiff.

Jeffrey D. Hedlund, Esq., and Michelle E. Weinberg, Esq., Faegre Baker Daniels LLP, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

      Neil Wolfson, owner of the Neil Wolfson Agency in Merrick, New York, has filed a complaint and accompanying motion under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, seeking to vacate a final arbitration award in favor of Allianz Life Insurance Company of North America ("Allianz").[1] (Doc. No. 1, Compl.; Doc. No. 2, Mot. to Vacate Arbitration Award.) The arbitration award, issued on July 25, 2014, found Wolfson liable for $542,807.25 in commission chargebacks on over $1.6 million that he received on the sale of two Allianz life insurance policies, which either lapsed or were

---

[1] Although Wolfson was represented by counsel during the arbitration proceedings, he initiated this action *pro se*. He has since retained counsel to represent him in these proceedings. (*See* Doc. No. 39.)

surrendered within thirteen months of their issuance.[2] (*See* Doc. No. 8, Attach. 2 at 162–65.) As grounds for vacating the arbitration award pursuant to § 10, Wolfson contends that the award was procured by fraud and otherwise "failed to draw its essence" from his agent agreement with Allianz. (Compl. ¶¶ 30–47; Doc. No. 6, Mem. in Supp. of Mot. to Vacate at 13–20.) Allianz contests those allegations and has filed its own motion to confirm the arbitration award pursuant to 9 U.S.C. § 9. (Doc. No. 19, Mot. to Confirm Arbitration Award; Doc. No. 21, Mem. in Opp. to Mot. to Vacate.) It also requests post-award, prejudgment interest at a rate of 10% per year pursuant to Minn. Stat. § 549.09, subd. 1(a) and (c)(2). (Doc. No. 16, Answer at 7; Doc. No. 37, Reply Mem. in Supp. of Mot. to Confirm Arbitration Award at 5.)

The parties' cross-motions to vacate or confirm the arbitration award have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1). (*See* Doc. No. 35.) For the reasons detailed below, this Court respectfully recommends that Wolfson's motion to vacate be denied, that Allianz's motion to confirm the arbitration award be granted, and that judgment be entered in Allianz's favor. This Court further recommends that Allianz be awarded prejudgment interest at a rate of 10% per year, as mandated by state law.

## I.  BACKGROUND

Allianz, a Minnesota-based corporation, provides annuities and life insurance policies through a nationwide network of independent Field Marketing Organizations ("FMOs"), general agents, and license-only agents. (*See* Doc. No. 8, Attach. 2 at 23–28;

---

[2] The arbitrator who issued the award was Madge S. Thorsen.

Doc. No. 21 at 3.) General agents are entitled to commissions directly from Allianz and, correlatively, are subject to commission chargebacks on policies that have been surrendered (*i.e.*, canceled) or have lapsed within certain periods of time. (*See* Doc. No. 8, Attach. 2 at 40.) License-only agents, by contrast, are neither entitled to commissions directly from Allianz nor personally responsible for any chargebacks. (*See id.* at 24, 27–29, 49–50, 54–55, 86; *see also* Doc. No. 1, Attach. 1 at 2, 6, 11.) Instead, commissions on sales made by license-only agents are paid directly to their overarching FMO, which then compensates those agents and is ultimately responsible for any applicable commission chargebacks. (*See* Doc. No. 8, Attach. 2 at 24, 27–29, 49–50, 54–55, 86–87.)

In July 2007, Wolfson and Allianz entered into an Agent Agreement and FMO Addendum, whereby Wolfson became both a license-only agent and an FMO with Allianz. (*See* Doc. No. 1, Attach. 1 at 2–11; Doc. No. 8, Attach. 2 at 106.) In his capacity as an FMO, Wolfson was responsible for soliciting applications for Allianz's insurance policies "through the agents in [his] hierarchy" (himself included), was entitled to "override commissions on policies sold by [those] agents," and was "subject to chargebacks" on commissions in the event that insurance policies sold by himself or his agents were surrendered or had lapsed within specified periods of time. (Doc. No. 1, Attach. 1 at 10–13; *see also* Doc. No. 8, Attach. 1 at 27–28, 42.) At the outset of their relationship, Allianz provided Wolfson with its February 20, 2006 FMO Commission Guidelines, which by its terms supplemented and became part of their agreement. (Doc. No. 1, Attach. 1 at 5, 12–13.) Those guidelines provided, in relevant part, that Wolfson

3

would be responsible for commission chargebacks on Allianz GenDex II life insurance policies that were "surrendered" within fifteen months.[3] (*Id.* at 12.) The guidelines also stated, however, that they could be unilaterally modified by Allianz at any time and that any such modifications would be "immediately effective on the date the Company posts the change on its Web site," would "supersede[] all prior Commission Guidelines," and would apply to "any policies written after the effective date thereof." (*Id.* at 13.)

Before the end of 2008, Allianz modified its FMO Commission Guidelines seven times. (Doc. No. 8, Attach. 1 at 36–56; *Id.*, Attach. 2 at 31–32.) Each of those revised guidelines, including the four adopted by Allianz between January and November 2008, provided that FMOs would be subject to commission chargebacks on GenDex II life insurance policies that were "surrendered *or lapsed*" within specified periods of time. (Doc. No. 8, Attach. 1 at 36, 38, 42, 45, 48, 51, 54) (emphasis added). In the summer and fall of 2008, Wolfson sold the two GenDex II life insurance policies that underlie these proceedings. The first, a $10 million policy issued in June 2008 to a customer named Eden, lapsed within eight months due to nonpayment of premiums ("Eden Policy"). (*See* Doc. No. 8, Attach. 2 at 34–36.) The second, a $20 million policy issued in November 2009 to a customer named Bloom, was surrendered within 13 months ("Bloom Policy"). (*See id.* at 39–41.) Wolfson received over $1.6 million in commissions on the sale of those two policies — $1,170,000 on the Eden Policy and $488,813.52 on the Bloom

---

[3]   Life insurance policies surrendered within six months were subject to a full commission chargeback, within seven to twelve months to a 50% chargeback, and within thirteen to fifteen months to a 25% chargeback. (Doc. No. 1, Attach. 1 at 12.)

Policy. (*See id.* at 9–10, 35, 40.) Under the terms of the original February 2006 FMO Commission Guidelines, Wolfson owed Allianz a 25% commission chargeback on the surrendered Bloom Policy (*i.e.*, $122,203.38). (*See* Doc. No. 1, Attach. 1 at 12.) But under the then-existing FMO Commission Guidelines, provided that they had become effective through posting on Allianz's website, Wolfson would also owe a 50% commission chargeback on the lapsed Eden Policy (*i.e.*, $585,000). (*See* Doc. No. 8, Attach. 1 at 45, 48, 51; *see also id.*, Attach. 2 at 38–39.) Together, the total chargeback on both policies would be $707,203.38.

After the Eden Policy lapsed in February 2009, Allianz notified Wolfson that he owed a $585,000 chargeback on that policy and proposed a debt repayment plan. (*See* Doc. No. 8 at 25; *id.*, Attach. 2 at 111.) When Wolfson inquired about the claimed chargeback, Allianz sent him a copy of the commission guidelines applicable to general agents. (*See* Doc. No. 8, Attach. 2 at 112–13.) While those guidelines had no relevance to license-only agents and FMOs, they did mirror the modified FMO Commission Guidelines in providing for chargebacks on "surrendered or lapsed" life insurance policies. (*See* Doc. No. 8 at 46.)

Wolfson made two initial payments, totaling $98,681.63, towards the claimed chargeback on the Eden Policy, and Allianz deducted a total of $65,714.50 from his incoming commissions to satisfy the debt on the Eden and Bloom policies, leaving a total

5

remaining balance of $542.807.25 on both policies.[4] (*See id.* at 5, 35–36, 67; *id.*, Attach. 2 at 44–46, 50.) Wolfson, however, stopped making further payments once he realized that Allianz was relying on the commission guidelines governing general agents. (*See* Doc. No. 8, Attach. 2 at 114.) In July 2010, Allianz terminated Wolfson's contract and hired a debt collection agency to recoup the remaining balance of the claimed chargebacks. (*See* Doc. No. 8 at 76; *id.*, Attach. 2 at 50–52.)

After three years of unsuccessful negotiations and fruitless attempts at collection, Allianz filed a notice of arbitration with the American Arbitration Association on August 23, 2013, which it later amended on October 4, 2013.[5] (*See* Doc. No. 8 at 2; *id.*, Attach. 2 at 53–54.) In its amended arbitration claim, Allianz alleged that Wolfson was liable for the $542,807.25 in chargebacks on the Bloom and Eden policies under the General Agent Commission Guidelines, which it attached to its filing. (Doc. No. 8 at 3–5, 15–16.) Despite Wolfson's insistence that he was not a general agent subject to the General Agent Commission Guidelines, Allianz continued to rely on those guidelines in its pretrial brief. (*See id.* at 27–29, 34–37, 45–47.) On June 3, 2014, the appointed

---

[4]   It is not clear what the individual balance remaining on each policy was at the time of the arbitration; the arbitrator's decision merely noted that the total balance remaining on both policies was $542,807.25. (*See* Doc. No. 8, Attach. 2 at 163.) It is important to note that while Wolfson challenges the entire arbitration award for $542.807.25, his arguments center on the chargeback for the lapsed Eden Policy and do not dispute that he was subject to a chargeback on the surrendered Bloom Policy. (*See* Doc. No. 6.)

[5]   The Agent Agreement executed by Wolfson and Allianz provided that "[a]ny claim or dispute arising in connection with this Agreement shall be submitted to binding and nonappealable arbitration by the American Arbitration Association (AAA) in Minneapolis, Minnesota." (Doc. No. 1-1 at 9.) The agreement further provided that "[t]he arbitrator shall apply the law of the State of Minnesota." (*Id.*)

6

arbitrator tentatively scheduled a hearing for July 7, 2014, and ordered the parties to exchange briefs, exhibits, and witness lists by June 30, 2014. (Doc. No. 8, Attach. 1 at 2.)

Wolfson, through counsel, filed his pretrial brief on June 23, 2014. (*See id.* at 4–9.) While conceding that the surrendered Bloom Policy was subject to a chargeback under the February 2006 FMO Commission Guidelines, Wolfson argued that Allianz's claim with regard to the lapsed Eden Policy "was based on misrepresentations" that he was a general agent. (*Id.* at 4–8.) Wolfson maintained that he was a license-only agent and FMO, not a general agent, and that he was only subject to chargebacks on surrendered life insurance policies under the February 2006 FMO Commission Guidelines that he had received from Allianz. (*Id.* at 4–6.)

On June 24, 2014, Allianz filed a supplemental pretrial brief, conceding for the first time that Wolfson was a license-only agent and not a general agent subject to the General Agent Commission Guidelines. (Doc. No. 8, Attach. 1 at 27–28.) Allianz nevertheless argued that Wolfson, in his capacity as an FMO, was still subject to the claimed chargebacks under the modified FMO Commission Guidelines, which it had posted to its website before the Eden or Bloom policies had issued. (*Id.* at 28–29.) Allianz attached copies of the modified FMO Commission Guidelines, including those adopted after January 1, 2008, to its supplemental brief. (*Id.* at 34–56.) Later that same day, Wolfson filed an amended pretrial brief arguing that the modified FMO Commission Guidelines were not applicable to him and that Allianz had entered the arbitration proceedings "with unclean hands," as evidenced by its "ever changing positions with regard to [his] status . . . and the applicable commission guidelines." (*Id.* at 64, 67.)

7

Wolfson's attorney did not, however, seek further discovery on Allianz's revised theory of liability or request a continuance of the arbitration hearing to conduct such discovery.

At the arbitration hearing, held two weeks later on July 8, 2014, the parties debated which commission guidelines applied to the Eden and Bloom policies. In support of its newly articulated legal theory, Allianz called its Senior Director of Enterprise Producer Services and Operations Relationship Management, Denise Venus. Venus testified that Allianz had mistakenly entered Wolfson as general agent in its internal records, a mistake which it later relied on during the initial stages of the arbitration proceedings. (Doc. No. 8, Attach. 2 at 26–27, 74.) Venus insisted, however, that Allianz was not "intending to deceive anyone in making the allegation that [] Wolfson was a general agent," and explained that Wolfson's actual status as a license-only agent was ultimately irrelevant because, as an FMO, he was responsible for chargebacks on commissions received by agents within his hierarchy, including himself. (*Id.* at 27–29, 42, 48.) Venus further testified that Allianz's web logs and other records confirmed that the modifications to the FMO Commission Guidelines, each of which provided for chargebacks on both surrendered and lapsed policies, had been posted to the company's website. (*Id.* at 32–33, 55–57, 96–97.) Accordingly, the modified guidelines, and not the February 2006 FMO Commission Guidelines, applied to the two policies. (*Id.* at 55.)

Wolfson's attorney extensively cross-examined Venus about the modified FMO Commission Guidelines. (*Id.* at 55–56.) Venus testified on cross-examination that she did not bring the relevant web logs and records to the hearing, though she held firm to her earlier testimony that those documents confirmed that the modified guidelines had been

8

posted to Allianz's website. (*Id.*) Counsel also questioned Venus about the applicability of the February 2006 FMO Commission Guidelines:

> Q: . . . . If the guideline had been superceded [sic], modified seven times, why did you submit as evidence with the trial brief the same exact 2/2006 guideline?
>
> A: It was a mistake.
>
> Q: Is it possible you're mistaken as with regard to your review of the web logs and web confirmation sheets?
>
> A: No. It's standard practice to change the Commission Guidelines and post them to the web.

(*Id.* at 64.) While Wolfson testified that he was never notified of any changes to the February 2006 Commission Guidelines and did not see any such changes on Allianz's website, he conceded that he never specifically looked for modifications to the commission guidelines. (*Id.* at 108–09, 137–42.) At the conclusion of Wolfson's testimony, both sides waived closing arguments and indicated that they had no further questions, concerns, or comments. (*Id.* at 143–45.)

The arbitrator issued a final award on July 25, 2014, granting Allianz $542,807.25 in commission chargebacks on the Eden and Bloom policies, plus pre-award interest at a rate of 6% per year from August 23, 2013, to the date of the award. (*Id.* at 162–64.) The arbitrator found that the February 2006 FMO Commission Guidelines "were subject to change through the mechanism of posting on [Allianz's] website," that the evidence showed that the guidelines were modified in January 2008 to provide for chargebacks on surrendered and lapsed insurance policies, and that Wolfson was therefore liable for the remaining balance of the claimed chargebacks on both the lapsed Eden Policy and the

9

surrendered Bloom Policy. (*Id.* at 162–63.) The arbitrator acknowledged that Allianz "made repeated errors and mistakes" in identifying Wolfson as a general agent subject to the General Agent Commission Guidelines, which needlessly "prolonged and complicated the entire dispute" until Allianz finally corrected itself in its supplemental pretrial brief. (*Id.* at 163–64.) For that reason, the arbitrator declined to grant Allianz attorney's fees and costs. (*Id.* at 164.) But the arbitrator found that Allianz "did not intentionally mislead" and that its initial errors were "ultimately not determinative" on the issue of Wolfson's liability for the chargebacks. (*Id.* at 163.)

On October 24, 2014, Wolfson filed his complaint and accompanying motion to vacate the arbitration award pursuant to § 10 of the FAA. (Doc. Nos. 1–2.) Allianz, in response, filed a counterclaim and cross-motion to confirm the arbitration award pursuant to 9 U.S.C. § 9, which requires a federal court to confirm an arbitration award unless it is vacated, modified, or corrected under the provisions of the FAA. (*See* Doc. No. 16 at 5–6; Doc. No. 19); *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) ("Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11.").

## II. ANALYSIS

The FAA, seeking to substantiate a national policy in favor of arbitration, provides for expedited and limited judicial review of arbitration awards, which extends only to the specific statutory grounds for vacatur and modification set forth in 9 U.S.C. §§ 10–11, and not to general claims of factual, evidentiary, or legal error. *See Hall Street*, 552 U.S. at 578, 582–84, 588 (emphasizing that the FAA provides for "expedited" and

"streamlined" judicial review under the specific statutory grounds for vacating or modifying an arbitration award, and does not authorize "full-bore legal and evidentiary appeals"); *Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 488 (8th Cir. 2010) (stating that an arbitration award may only be vacated in the "four limited circumstances" set forth in § 10, and that "[c]ourts have no authority to reconsider the merits of an arbitration award, even when the parties allege that the award rests on factual errors or on a misinterpretation of the underlying contract"). Wolfson relies on one of those statutory grounds, which permits a federal court to vacate an arbitration award if it was "procured by . . . fraud."[6] 9 U.S.C. § 10(a)(1); (*see* Compl. ¶ 30; Doc. No. 6 at 13–15). To prevail on that claim, Wolfson must prove "fraud by clear and convincing evidence," show that "the fraud was not discoverable by due diligence before or during the [arbitration] proceeding," and demonstrate that "the fraud was materially related to an arbitration issue." *MidAmerican Energy Co. v. Int'l Bhd. of Elec. Workers*, 345 F.3d 616, 622 (8th Cir. 2003). In turn, fraud traditionally requires a false representation of material fact, made knowingly and with intent to deceive, which induces another party to act. *See*

---

[6] Wolfson also contends that the arbitrator's decision "failed to draw its essence" from his agreement with Allianz and is therefore subject to vacatur under the judicially-created doctrine articulated in *Schoch v. InfoUSA, Inc.*, 341 F.3d 785, 788 (8th Cir. 2003). (*See* Compl. ¶¶ 40, 45; Doc. No. 6 at 19–20.) The Supreme Court, however, has made clear that the only grounds for vacating an arbitration award are those specifically set forth in § 10, thus abrogating the judicially-created doctrine that Wolfson invokes. *See Hall Street*, 552 U.S. at 584 ("We now hold that §§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification."); *Med. Shoppe Int'l*, 614 F.3d at 489 (explaining that, after *Hall Street*, courts may not vacate arbitration awards "on grounds other than those listed in the FAA," including the ground that the award "fails to draw its essence from the agreement") (quotation omitted).

*Curtis Lumber Co., Inc. v. La. Pac. Corp.*, 618 F.3d 762, 774 (8th Cir. 2010); *Goff v. Dakota, Minn. & E. R.R. Corp.*, 276 F.3d 992, 996 (8th Cir. 2002); *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir. 1985). But given "the strong federal policy favoring arbitration," fraud under the FAA demands a "greater level of improper conduct" than is typically required. *See Goff*, 276 F.3d at 996 (quoting *Pac. & Arctic Ry. & Navigation v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991)).

**A.     The Parties' Cross-Motions to Vacate or Confirm the Arbitration Award**

Wolfson's fraud claim, as set forth in his written filings and clarified by his counsel's arguments at the motions hearing, consists of two basic components. First, that Allianz, in a deliberate attempt to mislead both Wolfson and the arbitrator, initially pursued a theory of liability based on the false representation that Wolfson was a general agent, only to pull a sudden "bait and switch" shortly before the arbitration hearing by pursuing a different legal theory (based on previously undisclosed evidence) that he was liable for the claimed chargebacks under the modified FMO Commission Guidelines. (*See* Compl. ¶¶ 23–25, 30–33; Doc. No. 6 at 3, 10–11, 13–15, 18.) Wolfson contends that this "eleventh-hour change in position" was calculated to obfuscate and confuse "to the point of fraudulently misleading the arbitrator into rendering a decision in [Allianz's] favor."[7] (Doc. No. 6 at 12.) Second, Wolfson suggests that Allianz's revised theory of

---

[7]     Wolfson repeatedly characterizes Allianz's change of position as occurring on "the immediate eve of arbitration," at the "eleventh-hour," and only "a few days" before the arbitration hearing. (Doc. No. 6 at 8, 11–12, 15, 18; Doc. No. 36 at 1.) From that premise, he contends that he "had no opportunity to prepare to defend this last minute change[]" or "to conduct discovery on this newly articulated theory." (Doc. No. 36 at 1–2.) Allianz's

(Footnote Continued on Next Page)

liability was itself based on a false representation, specifically arguing that Venus' testimony that the modified FMO Commission Guidelines had been posted to Allianz's website was not supported by documentary evidence. (*See* Compl. ¶¶ 31, 33–34, 43; Doc. No. 6 at 11–12, 18.)

Allianz asserts that Wolfson has not met his burden under § 10(a)(1) because he has failed to present clear and convincing evidence that it acted with intent to deceive or fabricated the evidence regarding the modified FMO Commission Guidelines. (Doc. No. 21 at 18–21.) Allianz further argues that there was no fraud because its revised position (and the evidence supporting it) was disclosed during the arbitration proceedings, addressed by the parties, and found not to be determinative on the ultimate question of Wolfson's liability for the claimed chargebacks. (*Id.* at 18–22.) Allianz concludes that Wolfson is attempting to "convert prehearing confusion as to the specific documents supporting the contractual basis for [its] claim — which was cleared up and

---

(Footnote Continued from Previous Page)
change of position, however, occurred two weeks before the arbitration hearing — not a few days before or on the immediate eve of arbitration — leaving Wolfson and his attorney an opportunity to defend against that position and, if necessary, to seek further discovery. Indeed, Wolfson challenged Allianz's new theory in his amended pretrial brief and at the arbitration hearing itself, where his attorney extensively cross-examined Venus about the applicability and effectiveness of the modified FMO Commission Guidelines. (*See* Doc. No. 8, Attach. 1 at 64–67; *id.*, Attach. 2 at 54–94.) And Wolfson could have requested, either before or during the arbitration hearing, more time to conduct additional discovery on Allianz's new theory of liability. His failure to do so does not mean that he was denied an opportunity to conduct discovery on that new theory. In any event, whether Wolfson was deprived of an opportunity to adequately respond to Allianz's new theory has little bearing on whether the arbitration award was procured by fraud.

addressed by both sides before and during the [a]rbitration hearing — into a baseless fraud allegation." (*Id.* at 1 (emphasis omitted).)

This Court agrees with Allianz that Wolfson has failed to show that the arbitration award was procured by fraud. As to the first facet of his fraud claim, Wolfson has not established by clear and convincing *evidence* — as opposed to allegation, speculation, or inference — that Allianz intended to deceive the arbitrator when it erroneously claimed that Wolfson was liable as a general agent and then, when confronted with the flaw in that position, pursued a revised legal theory based on the modified commission guidelines applicable to FMOs. During the arbitration proceedings, Venus testified that Allianz did not "intend[] to deceive anyone in making the allegation that [] Wolfson was a general agent" and the arbitrator implicitly credited that testimony, finding that Allianz did not "intentionally mislead" when it initially claimed that Wolfson was a general agent. The arbitrator was entitled to credit Venus' testimony regarding the lack of intent to deceive, and Wolfson has not presented any evidence, much less clear and convincing evidence, to rebut that testimony. *See Int'l Chem. Workers Union v. Columbian Chem. Co.*, 331 F.3d 491, 496 (5th Cir. 2003) ("We do not look over the shoulder of the Arbitrator in order to alter his credibility decisions . . . ."); *Rogers v. Dep't of Def. Dependents Sch., Germany Region*, 814 F.2d 1549, 1553–54 (Fed. Cir. 1987) (explaining that credibility determinations are "within the discretion of the arbitrator and [are] virtually unreviewable on appeal").

More importantly, even if Wolfson could demonstrate that Allianz acted with the requisite intent, Wolfson simply cannot show that the misrepresentation regarding his

14

agency status was "not discoverable by due diligence before or during the proceeding" and actually affected the arbitrator's decision. *See MidAmerican Energy Co.*, 345 F.3d at 622. The alleged fraud was not only discoverable during the underlying proceedings, it was actually disclosed by Allianz in the supplemental pretrial brief that it filed two weeks before the arbitration hearing. (*See* Doc. No. 8, Attach. 1 at 27–29.) Moreover, the arbitrator's decision acknowledged Allianz's "repeated errors and mistakes" in claiming that Wolfson was a general agent, but found that those errors were "ultimately not determinative" because Wolfson was liable for the claimed chargebacks under the modified FMO Commission Guidelines, not under the guidelines applicable to general agents. (Doc. No. 8, Attach. 2 at 163.) Simply put, the arbitration award was not "procured" by the alleged fraud concerning Wolfson's agency status because Allianz disclosed its mistake during the underlying proceedings, the arbitrator was fully aware that Wolfson was not a general agent, and the arbitrator based her decision on a different ground altogether.[8] *See Envtl. Barrier Co., LLC v. Slurry Sys., Inc.*, 540 F.3d 598, 608 (7th Cir. 2008) (explaining that for an arbitration award to be "procured" by fraud, there must be "a nexus between the purported fraud and the arbitrator's final decision"); *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503 (6th Cir. 2003) ("[W]hen an arbitrator hears the allegation of fraud and then rests his decision on

---

[8] Wolfson contends that the alleged fraud concerning his agency status was material because it went to the "very heart . . . of whether [he] was subject to the chargebacks for the lapsed policies as claimed by Allianz in the first place." (Doc. No. 6 at 15.) The asserted fraud, however, was not material to the revised position that Allianz advanced at the arbitration hearing and ultimately prevailed on, which was based entirely on the modified FMO Commission Guidelines.

grounds clearly independent of issues connected to the alleged fraud, the statutory basis for vacatur is absent.") (quotation and brackets omitted); *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1022–23 (5th Cir. 1990) (reversing the vacatur of an arbitration award where the arbitration panel heard evidence of the alleged fraud and ruled it immaterial).

As for the second component of his fraud claim, Wolfson has not presented any evidence that Venus lied when she testified that the modified FMO Commission Guidelines had been posted to Allianz's website. Indeed, at the motions hearing, Wolfson's counsel admitted that there is no evidence that Venus' testimony was false.[9] Wolfson nevertheless complains that Allianz failed to offer "any proof" that the modified guidelines had been posted to its website or, at the very least, presented "insufficient and improper proof regarding the 'modifications.'" (Doc. No. 6 at 11, 18; Doc. No. 36 at 1–

---

[9] At the motions hearing, Wolfson's counsel requested an opportunity to file supplemental briefing on whether he could engage in further discovery in an attempt to uncover actual evidence that Venus' testimony was false. When asked on what basis he could engage in additional discovery following the completion of the underlying arbitration proceedings, Wolfson cited Federal Rule of Civil Procedure 60(b). Rule 60(b), however, is not a discovery tool, and the Supreme Court has made clear that the FAA does not authorize "full-bore legal and evidentiary appeals that can render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process." *Hall Street*, 552 U.S. at 588 (quotation and brackets omitted). Allowing a party to engage in additional discovery after arbitration proceedings have come to an end, and based on little more than a desire to unearth possible evidence of fraud, would undercut the limited and expedited review contemplated by the FAA. *Cf. Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1145 (10th Cir. 2008) (upholding a district court's refusal to consider extrinsic evidence "[g]iven the very limited scope of judicial review of arbitration awards" and the absence of any "authority holding that a court has a duty to consider extrinsic evidence going to the merits of the dispute when ruling on a motion to vacate or a motion to confirm an arbitration award").

2.) But Venus' testimony that Allianz posted the modified FMO Commission Guidelines to its website is some proof of that fact. Witness testimony, no matter how self-serving or uncorroborated by documentary evidence, is still proof, which may, as here, be credited by the relevant factfinder. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1246–47, 1253 (11th Cir. 2013); *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). And under the FAA, this Court has no authority to review whether that proof was sufficient to support the arbitrator's factual finding that the modified FMO Commission Guidelines applied to the Eden and Bloom policies. *See Hall Street*, 552 U.S. at 588 (explaining that the FAA provides for "the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway," and does not authorize "full-bore legal and evidentiary appeals"); *Med. Shoppe Int'l*, 614 F.3d at 488 (stating that courts provide "an extraordinary level of deference" to arbitration awards and "have no authority to reconsider the merits of an arbitration award, even when the parties allege that the award rests on factual errors or on a misinterpretation of the underlying contract.") Wolfson's repeated complaints about the absence of proper or adequate proof to support a finding that Allianz posted the modified FMO Commission Guidelines to its website asks this Court to do what it is not authorized to do — reconsider the factual and legal merits of the arbitrator's award.[10]

---

[10]     Wolfson complains that he was never made aware of or agreed to the modifications to the FMO Commission Guidelines. (*See* Compl. ¶¶ 11, 41; Doc. No. 6 at 8, 11, 18; Doc. No. 36 at 1–2.) But under the terms of the parties' agreement, Allianz could unilaterally modify the FMO Commission Guidelines at any time and it was incumbent upon Wolfson to check Allianz's website for any such changes. The Agent

(Footnote Continued on Next Page)

Because Wolfson has not established that the arbitration award was procured by fraud, this Court respectfully recommends that his motion to vacate the award be denied, that Allianz's motion to confirm the award be granted, and that judgment be entered in Allianz's favor. *See Hall Street,* 552 U.S. at 582 ("[A] court must confirm an arbitration award unless it is vacated, modified, or corrected as prescribed in §§ 10 and 11.") (quotations omitted).

### B. Post-Award, Prejudgment Interest

In addition to the pre-award interest ordered by the arbitrator, Allianz requests post-award, prejudgment interest pursuant to Minn. Stat. § 549.09, subd. 1(c)(2). (*See* Doc. No. 16 at 7; Doc. No. 37 at 5.) In federal diversity cases, prejudgment interest is governed by state law.[11] *See, e.g.*, *Macheca Transp. Co. v. Philadelphia Indem. Ins. Co.*, 737 F.3d 1188, 1196 (8th Cir. 2013); *Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1146

---

(Footnote Continued from Previous Page)
Agreement executed by Wolfson provided that Allianz could modify its commission guidelines after providing "reasonable notice," which was defined to include "notice posted on the Company's web site." (Doc. No. 1, Attach. 1 at 7–8.) Similarly, the FMO Commission Guidelines sent to Wolfson stated that they could "be modified by the Company," that any such modification would "supersede[] all prior Commission Guidelines," and that the modification would be "effective on the date the Company posts the change on its Web site, unless the posted notice indicates otherwise." (*Id.* at 13.) That Wolfson was unaware of the modifications and never agreed to them does not render them inapplicable.

[11] The FAA itself "bestow[s] no federal jurisdiction but rather requir[es] an independent jurisdictional basis." *Hall Street*, 552 U.S. at 581–82. Here, that independent basis is diversity of citizenship under 28 U.S.C. § 1332(a), as Wolfson is a citizen of New York, Allianz a citizen of Minnesota, and the amount in controversy exceeds $75,000. (*See* Compl. ¶¶ 1–3.)

(10th Cir. 2008). Under Minnesota law, a party that obtains an award in excess of $50,000 is automatically entitled to prejudgment interest at a rate of 10% per year from the time of the award until judgment is finally entered. *See* Minn. Stat. § 549.09, subd. 1(a) ("When a judgment or award is for the recovery of money, . . . interest from the time of the verdict, award, or report until judgment is finally entered *shall be computed by the court administrator . . . and added to the judgment or award*.") (emphasis added); *id.* § 549.09, subd. 1(c)(2) ("For a judgment or award over $50,000, . . . the interest rate *shall be ten percent per year until paid*") (emphasis added); *Redleaf v. Redleaf*, 807 N.W.2d 731, 735 (Minn. Ct. App. 2011) (holding that a "court does not have the discretion to ignore the unambiguous statutory mandate of Minn. Stat. § 549, subd. 1(c)(2)"). Given the clear mandate of Minnesota law, this Court respectfully recommends that Allianz be awarded prejudgment interest at a rate of 10% per year from the time of the final arbitration award, July 25, 2014, until judgment is entered in this case.[12]

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff Wolfson's Motion to Vacate the Arbitration Award (Doc. No. 2) be **DENIED**;

2. Defendant Allianz's Motion to Confirm the Arbitration Award (Doc. No. 19) be **GRANTED**;

---

[12] At a rate of 10% per year on an award of $542,807.25, Allianz is entitled to $148.71 per day in post-award, prejudgment interest beginning July 26, 2014.

3.    Judgment be entered in favor of Allianz in the amount of $542,807.25, plus pre-award interest at a rate of 6% per year from August 23, 2013, through July 25, 2014, as ordered by the final arbitration award; and

4.    Allianz be awarded prejudgment interest at a rate of 10% per year from July 26, 2014, until judgment is entered in this case.

Date:  March 26, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 9, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3,500 words. A district judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Eighth Circuit Court of Appeals.